Good morning, Your Honors. Judith Posner on behalf of the appellant, Dr. Roshkovan. Your Honors, I'd like to reserve 5 minutes of my 15 for rebuttal, if that's okay with the Court. Yes, please be reminded that the time shown on the clock is your total time remaining. When it goes to red, you're over time. Understood. Thank you, Your Honor. We're here today after the California Supreme Court's recent decision in Himes following this Court's certification, and that Himes decision eviscerates the District Court's causation analysis in this decision that served as an alternative ground to dismiss Dr. Roshkovan's complaint. Thus, although even before Himes, the District Court's causation decision was suspect based on the allegations in the second amended complaint, after Himes, we know that the District Court's causation analysis is contrary to the California Supreme Court's pronouncement on causation in a prescription judgment. What else would you allege to satisfy Himes? You've had opportunities to amend. What else do you have? Well, two things, Your Honor. First, the causation allegations in the second amended complaint, even before Himes, are sufficient because they allege that the doctors would not have prescribed Spreisel absent, had there been a warning of total vision loss due to retinal hemorrhaging. So even before Himes, we know that those allegations are in the second amended complaint. Himes changed the landscape because you don't need an allegation that the doctors would not have prescribed Spreisel if the warning had been given. You can also satisfy causation if you allege that a reasonable person hearing from the doctors to take the medication would have changed course and elected something different under the circumstances of the plaintiff. Is your position then with the existing allegations that they would satisfy the new standard? I think the complaint is entitled to amendment to satisfy the new allegations. I understand. And if you take what is there, Dr. Rashkevan is a dentist. Dr. Rashkevan specializes in dental surgeries, particularly implants. Accordingly, based on Dr. Rashkevan, his characteristics make him susceptible to a condition of total blindness that would impact his livelihood, his ability to function. And so those allegations about his profession and about his particularities are in the complaint. Now, following Himes, could he amend the complaint to further establish those allegations and go through the factors of Himes? Absolutely, he could. Now I would like you to answer my question. To answer your question, yes, the allegations are there, but could they be expounded upon? Yes. So is it your position that you allege in the complaint that the plaintiff would have declined treatment after receiving a stronger risk warning? Is that in your complaint? That is what could be added to the complaint to further comply with the new Himes decision. What complies with that? You answered just Kristen and said the complaint as it stands complies. So what about the complaint meets that requirement at this point? I think it's an inference that can be drawn based on the allegations that are currently in the complaint. And we know at this early stage the inferences are drawn in favor of the plaintiff, particularly given that this was a pro se pleading. And so yes, the allegations are there. Could they be expounded upon? Yes, certainly they could because Himes was not the law, as we know, when Dr. Rashkevan drafted his complaints. Could you discuss the preemption issue? Absolutely. And so given that Himes is here, the case really turns on the preemption issue. And when we look at preemption, that analysis requires several underlying principles. And one is that we know that preemption is a demanding defense. And the Supreme Court has told us that in the pharmaceutical context. The second is that at the pleading stage that we're at now, Bristol-Myers has the burden to show that there is an stance. So in other words, Dr. Rashkevan pled himself out. And third, as we just mentioned, the allegations are taken as true and there's particular liberality given to this pleading. And so under those principles, there are two bases under which this complaint can go forward. One is an initial labeling claim and one is a claim based on newly acquired information. Was the initial labeling claim raised before? Yes, Your Honor. In the district court? Yes. And the reason for that is if you look at the allegations in the complaint, specifically I'm looking at paragraphs 20, 21, 19, 65, and 67. Those allegations say that before the time Bristol-Myers submitted to the FDA and before the drug was approved, it was aware but did not warn that the drug may cause severe accelerated and irreversible eye-related conditions and disorders. And those severe accelerated and irreversible eye-related conditions and disorders were linked to total vision loss caused by retinal hemorrhage. And from those allegations, we know that Dr. Rashkevan's complaint included conduct that related to the pre or initial labeling period. And based on the California Supreme Court's pronouncements in Carlin, which is years old at this stage, and Himes, which is very recent, we know that California law respects strict liability and negligence claims based on a duty that parallels the federal law. Counsel, did the district court address the pre-approval labeling claim? The district court did not address that head on, but the district court did say that in addressing the newly acquired information said that the complaint alleges the opposite of newly acquired information. So if the complaint is alleging the opposite of newly acquired information, if you look at the dates in the complaint and you look at the pre-labeling allegations that I just referred to, I mean, in a way the district court was saying that there were. It didn't necessarily have to be post. Post labeling. Well, by saying the opposite of newly acquired information, then we're talking about information that was known before the labeling decision. Not necessarily before labeling, known before, at some point before, but not necessarily pre-labeling. I see your point. And again, with the liberality to which we are looking at this complaint, the allegations here are sufficient. And the fact that the district court didn't address it, it's the defendant's or Bristol Myers' burden to show that the complaint is barred as a matter of law. On that question, so Dr. Rashkevan was prescribed this medication under the 2018 labels, is that right? I believe that would have been correct. And the 2018 labels were FDA approved. They were changed by Bristol Myers. I actually, I don't know if there was specific FDA approval or they were changed pursuant to. I guess I'm just trying to figure out here what the time frame is for our consideration of newly acquired information. If Dr. Rashkevan were prescribed this medication under 2018, and there's some confusion, 2017, 2018 in the briefs, and the FDA had approved that, we would only then be looking to see whether there was new information in the short time frame after the FDA approval and maybe months in Mr. Rashkevan's prescription. And there isn't much, is there? First off, I don't think Bristol Myers has made that argument that the relevant time period is just the short time period of 2018 further. You can see that's the rule, right? If the newly acquired information, that clock resets every time we have a new FDA approved label, because the preemption would have to apply before then because they couldn't do anything else. And again, I don't recall that they have, that Bristol Myers had said that in 2017 or 2018 there was this restarting of the clock based on FDA approval. But if the FDA approves the label, how can you challenge the label? If the FDA has approved it, under the law you can't challenge the labeling unless there's some newly acquired information that would have allowed Bristol Myers or would have imposed a duty upon them to change the labeling. So I don't understand why you think that's an issue. From my perspective, what I understand is that the labeling was approved back in 2007 around then, I believe. And so the newly acquired information is what occurred post that approval, not of something in 2017 or in 2018. And in any case... Is that because you were hearkening back to your earlier answer where you said that the label was changed but you're not sure that there was a newer FDA approval? Because they can change the label under the regulations. I understand that, but I'm trying to figure out why you're taking the position you're taking in response to Judge Rawlinson. Because you just said, if I can just catch up. Your understanding is that the label was approved back in, I think you said 2005. So you're taking all of that forward. And so Judge Rawlinson, well, both of my colleagues asked you about a more recent FDA approval. I recognize that you said, I think the label was changed. And I appreciate why that is. But is it your position that you're not recognizing these earlier FDA approvals, 2017, 2018, regarding pediatric use? The later. You're not recognizing any later changes. Or approvals from the FDA. Is that why we're missing each other? Well, again, I think Bristol-Myers would have to be relying on approvals by the FDA in 2017 and 2018 to show some kind of preemption. And this is where I was, and they are not. And even if they were, Dr. Rashkevan's allegations include studies from 2018 and 2019 related to total vision loss. And I believe he even cites one adverse event that occurred shortly in the weeks or months before he was prescribed the medication. How is that information new and actionable by Bristol-Myers for purposes of evading preemption? That information is new and actionable because it is evidence linking the taking of the medication to retinal hemorrhage causing total vision loss. And that's different from evidence that was previously available for the FDA approved labels in 2017 and 2018? They did not warn of total vision loss in 2017 and 2018. So to the extent they are collecting new data that shows that more patients or new patients are experiencing total vision loss, yes. I believe I've used a lot of my time. So I think I will let the other side go. Thank you. Julianna Walker for Bristol-Myers Squibb and may it please the court. Plaintiff suggests that the ground underneath his appeal has so shifted that the only option is remand. That is not the case. The district court's preemption analysis was sound and it provides the most straightforward approach to affirming the district court's dismissal of plaintiff's claims with prejudice. Plaintiff has had three opportunities to amend his complaint in a way that would state a plausible claim. He is not entitled to a fourth. I think your friend is right. Certainly the fact of the 2017 and 2018 FDA approved labels is not highlighted in your briefs. What do you say to that point? What labels are we considering? What are the last FDA approved labels that we should be considering for preemption purposes and newly acquired evidence? Thank you. I think it's important to note that the FDA approved label wasn't really disputed in the district court proceedings below. Those were the warnings that were applicable at the time that Dr. was prescribed. And that I think is the relevant portion when you're looking at the CBE regulation and determining whether there's new information that is not previously submitted to the FDA, which would reveal a risk that is of a different type, a different severity or a different frequency that is listed in the governing label itself. And, you know, in the district court proceedings below and again on appeal, plaintiff has not been able to identify any information that identifies a risk that is different in type, in severity or frequency than what was identified. Where do those labels disclose a risk of vision problems arising from hemorrhaging? So I think the best place to look is at 2 ER 94 and 2 ER 11. And in both of those tables and in the pooled clinical data, there's information stating that risk of visual disorders, including visual impairment, is one of the risks of patients who may face, who are taking Sprexel. So, you know, in the district court acknowledged that itself, listed all of the different references to eye hemorrhaging, to vision disorder, to vision impairment. That are included in the Sprexel label. And in the four different types of categories of information that plaintiff delineated in his second amended complaint, none of those identified a risk that were of a different type or of a different severity than those that are listed in the label itself. Well, when you say not of a different severity, opposing counsel's argument that she made just a minute ago is that none of them ever disclosed risk of total vision loss. Can you show me, and I'm looking at the chart, I think, where you want me on, 2 ER 98, is that it? Yes, 94. Oh, 94. Am I going to see risk of total vision loss? It doesn't include total vision loss due to retinal hemorrhaging, but the district court did conclude that in the preemption analysis, that the language including vision impairment and vision disorder was sufficiently capacious to include the types of risks that plaintiff was identifying in his complaint. And if you look to the categories of information that plaintiff identified in the second amended complaint, the language of those, the FAERS report, the new clinical data, the post-marketing surveillance, that language in the quoted provisions in the complaint also doesn't mirror the language that plaintiff uses to describe his own injury. So if you look at... Part of that problem is you're swinging pretty hard here. I'm just making reference to the figure of speech about swinging for the bleachers. What you just argued is that there isn't a difference in severity, and I'm looking at this chart, and there seems to be a difference in severity, because I don't see total vision loss anywhere, and I appreciate your calling my attention to this part of the record. I have seen it, and I've looked elsewhere, and I don't... It's truly... It's a sincere question. If you can show it to me, this would be a good time. But between that and between the fact that we've got allegedly... Who knows? This is a very early stage of the case, but allegedly quite catastrophic damages, and we take really seriously that these complaints were drafted pro se. So you know all that, of course, but that's what I'm grappling with. So I wanted to tell you that and give you the best shot at responding. So I think the relevant comparison point is not the comparison between the warning and the injury the plaintiff alleges. The relevant comparison point is the warning and the purported newly acquired information that plaintiff is putting forth. And so I think our position is that in the newly acquired information that plaintiff attempts to identify, that information also doesn't mirror the language of the injury that plaintiff states. So if you look at the FAERS report, if you look at the clinical data, if you look at the post-marketing surveillance, you also won't see language that is mirroring the injury that plaintiff claims, which is what is required for him to satisfy that standard of showing newly acquired information. So I don't see that indication of risk of total vision loss anywhere, and that's your point, right? I think that's the point, exactly. So in order to satisfy the CBE regulation and to show that a manufacturer could make a unilateral change to the label, the question is not whether the label warns of the specific injury that plaintiff is alleging in this complaint. That's the adequacy point that the district court said, you know, I won't dismiss on the grounds of adequacy whether this warning specifically and clearly and unambiguously identifies the injury described in plaintiff's complaint. Rather, the comparison point is whether total vision loss due to retinal hemorrhaging is identified in the new information that plaintiff alleges, and it's just not there. And so we really do think that a very straightforward way to resolve this appeal is to say that the district court took very seriously the liberal pleading standard that is afforded to pro se litigants. If you look at each of the three dismissal orders, you'll see that he cited nearly every allegation that plaintiff made in the complaint, took all of those arguments that plaintiff raised in his opposition to our motion to dismiss, considered those very carefully, and determined that plaintiff had not shown that BMS could make a unilateral labeling change under the CBE regulation, and that's a prerequisite to showing that his claims were not federally created. Ms. Walker, so using that framing, what do we make of, say, I think paragraph 63 in the complaint of there are some 2019 studies that involve, you know, blindness, late 2018 eye hemorrhaging. I guess in 2019 we may be near or past the first prescription or use of the drug, but if our reference is simply the new information and a continuing duty to update or correct so it's accurate after any FDA approval, why wouldn't those 2019 reports of blindness qualify? I think that is one individual that reported blindness in the FAERS reporting, if I am referring to the same paragraph as Your Honor, and I believe that paragraph also there was some doubts about whether that was caused or just occurred at the same time that this individual was taking Sprycel, but I would also say that that does not mirror the injury that plaintiff identified in his complaint, which is total vision loss due to retinal hemorrhaging. And I know this seems like splitting a very fine hairs, but that's the way that plaintiff has approached his complaint, is that the Sprycel warning wasn't adequate because it didn't include the words total vision loss due to retinal hemorrhaging. So if plaintiff has to now say that BMS could have unilaterally amended its warning to include those specific words, he needs to identify newly... I guess under our liberal pleading standards and with pro se plaintiff, total vision loss and blindness. Close enough. And I think the point perhaps in the pleading was that the mechanism of that, and of course it is undisclosed in the complaint here, might have been the hemorrhaging that was disclosed. So maybe we... Why couldn't we more favorably read that in Mr. Rashkevan, Dr. Rashkevan's favor, to be equivalent to blindness, total vision loss? Well, I think in kind of reviewing what deference Mr. Rashkevan was entitled to at the district court's stage when he was pro se, this court should also consider the fact that plaintiff is counseled on appeal and they have not changed that theory of the complaint. So I don't think that the pro se pleading standard is a basis for allowing kind of a change of plaintiff's theory of his failure to warn claim when that theory has still been retained on appeal when Rashkevan is counseled as well. And so I do think that this court should hold plaintiff to his theory that in order to show that BMS could make a unilateral labeling change to include the words total vision loss due to retinal hemorrhaging, that you would have to identify newly acquired information that covers that precise injury. I do want to say that in order for plaintiff to prevail on appeal, he doesn't have to only cure the pleading deficiencies regarding preemption. He also has to be able to cure the causation deficiencies as well. And, you know, I think as the discussion earlier this morning showed, there are not allegations in the complaint that satisfy either the standard that applied when the district court resolved the motion to dismiss or the standard that exists under Himes. But that's tough for you because the district court even had an opportunity to look at this new standard, right? That's correct. But usually in Himes itself, the party advocating for the new standard acknowledged that the basis for his argument dated back all of the way to 2004 in this court's decision in modus. And we think at minimum this court's certification order two years before plaintiff counseled filed his opening brief placed them on notice to raise this causation argument in their opening brief, and they failed to do so. So we do think that any argument that he should now be able to avail himself of a new case decided after BMS filed this response brief is forfeited. What would he have to plead? What's your view of what he would have to plead? Does he have to plead the doctor's name? What does he have to do to satisfy Himes? He has to plead some facts tending to show that the physician would have either made a different prescribing decision or communicated a stronger warning to plaintiff based on a stronger warning for the label. I think the baseline for this court's analysis is, you know, the Rule 12b-6 standards saying you can't just recite the elements of a claim, which is what is in the complaint now, yet there have to be some facts tending to show that that element could be satisfied. And I do think that this court should remember that Himes maintained the key wisdom of the learned intermediary doctrine is that the duty to warn runs to the physician, not the patient. So the patient can't come forward and say, if there was a stronger warning under this new Himes standard, I can just say that I wouldn't have, or a patient in an objectively reasonable similar position wouldn't have taken this course of treatment. They still have to say that, based on that stronger warning label, my physician would have communicated that stronger warning label. They would have done something different based on stronger warnings in the label that would have allowed me to change my conduct or would have changed the physician's prescribing decision. And we pointed out in our response brief that even though plaintiffs said that they want an opportunity to amend their complaint again, they want an opportunity to make Himes-style allegations, neither in plaintiff's reply brief or at argument today. Do they really identify those allegations that they would put in their complaint to cure the causation deficiencies that exist? And, you know, I think if this court is to look at the district court's careful consideration of Raskoven's pleadings below, three times dismissing those claims as both preempted and failing to allege causation, to send that back for the district court to consider that yet again, I think this court has to have some assurance that plaintiff could present allegations that would cure the deficiency. And so far there is no evidence that plaintiff could do so. I do want to point this court briefly to the fact that the initial labeling claim is not preserved. This court should not resolve it. The paragraphs that plaintiff relied on, paragraph 19 and 21 of the second amended complaint did not put defendants on notice that they were making some allegation that challenged BMS's conduct during the FDA approval process. And even if BMS had been on notice of such a claim, Buckman squarely forecloses it. Buckman is talking precisely about this scenario where the relationship between an agency and the regulated entity is governed by a law that originates that relationship, governs that relationship, and terminates that relationship, and by allowing a state failure to warn claim to come in here, it really supplants the federal agency's enforcement discretion, which allows the agency to make those really sensitive policy judgments about when to enforce, when to make those decisions that allow, as Buckman explained, the agency to make the very sensitive and sometimes conflicting policy decisions that it has to make as an agency. So for the reasons discussed this morning and in the brief, the most straightforward way to resolve this appeal is to affirm the district court's sound decision that plaintiff's claims are preempted and to affirm the dismissal of plaintiff's claims with prejudice. Thank you, counsel. Rebuttal. Several points. Quickly, Your Honors. I want to pick up on Justice Judge Johnstone's question about newly acquired information and simply direct the court to paragraphs 37, 63, 64, 65, and 71 of the complaint, which all discuss blindness and retinal hemorrhaging in events 2018 or later. And those all suffice for newly acquired information to withstand the 12B6. I want to emphasize that counsel's discussion of the warnings relate to resolved against Bristol-Myers in the district court. We're not talking about adequacy here. We're talking about whether Bristol-Myers warned of total vision loss due to retinal hemorrhaging. And the answer to that is no. Counsel, is it your view that the warning has to be that specific? That's what the doctor has said in his complaint, that there was no warning connecting hemorrhaging or retinal hemorrhaging to blindness or total vision loss, which is the injury that he suffered. So it wouldn't have to be as specific as hemorrhaging in the retina, just vision loss? Are you arguing for more specificity than vision loss? Bristol-Myers says that their warning mentioned hemorrhaging, and I believe eye hemorrhaging in one instance. And so what the doctor is saying is that that was not sufficient because it didn't link to total. I'm asking you under the law, is it your argument that the warning had to be that specific? Yes, they had to warn of blindness, given the information that they knew at initial labeling and later based on newly acquired information. You're not arguing that they had to give the specific warning about blindness due to hemorrhaging, retinal hemorrhaging? Is that your argument? Did the warning have to be that specific? I believe it had to say blindness, and it did not. Thank you, counsel. And I just would conclude by saying that the forfeiture arguments that relate to initial labeling and also the causation that they're arguing based on Himes, you certainly cannot expect a pro se plaintiff to anticipate a California Supreme Court decision on causation that changed the law in California. And so his pleading, whether it was amended or not, before Himes just can't be held against him to a standard that did not exist. And when his allegations relate to both initial labeling and newly acquired information, under the standards, this court should reverse. All right. Thank you, counsel. Thank you. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court.
judges: RAWLINSON, CHRISTEN, JOHNSTONE